AO93 Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the
District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>Information Associated with Apple ID<br>tommy.townsend@live.com<br>that is Stored at Premises Controlled by Apple, Inc. | Case No.   22-9489 MB |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of California:

**As further described in Attachment A.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

**As set forth in Attachment B.**

**YOU ARE COMMANDED** to execute this warrant on or before 12/29/2022 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>any United States Magistrate Judge on criminal duty in the District of Arizona.</u>

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for  30  days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   <u>12/15/2022 @ 6:03pm</u>        *E.S.Willett*
                                                        *Judge's signature*

City and state: <u>Phoenix, Arizona</u>          <u>Honorable EILEEN S. WILLETT, U.S. Magistrate Judge</u>
                                                        *Printed name and title*

## ATTACHMENT A

### DESCRIPTION OF THE PROPERTY TO BE SEARCHED

This warrant applied to information associated with the Apple Account associated with the email address tommy.townsend@live.com, from January 1, 2020 to the date the legal process is signed, that is stored at premises owned, maintained, controlled, or operated by Apple, Inc. a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

## **ATTACHMENT B**

### **PARTICULAR THINGS TO BE SEIZED AND SEARCHED**

I.      **Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made on November 18, 2022 under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A, from January 1, 2020 to present:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP Address used to register the account, the account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

        c.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

        d.      The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

        e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

        f.      All activity, connection, and transactional logs for the account (with associate IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access

2

of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of services used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

k.      Notwithstanding 18 U.S.C. §§ 2252 and 2252A or any similar statute or code, Apple, Inc. shall disclose responsive data by sending it to FBI – Phoenix, c/o:  SA Candace M. Rose, 21711 North 7th Street, Phoenix, Arizona, 85024.

l.      The Provider is hereby ordered to disclose the above information to the government with **14 days** of service of this warrant.

## II.      Information to be seized by the government

All information described above in Section I that constitutes contraband, fruits, evidence and/or instrumentalities of violations of 18 U.S.C. §§ 2251(a) and (e); 18 U.S.C. §§ 2252(a)(2); 18 U.S.C. §§ 2252(a)(4)(B); 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); 18 U.S.C. § 924(c)(1)(A); and 18 U.S.C. §§ 1519 involving the accounts listed in Attachment A since January 1, 2020, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s):

3

b.      Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crimes under investigation and the account subscriber;

c.      Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

d.      Evidence indicating the subscriber's state of mind as it relates to the crimes under investigation, and

e.      Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

In the Matter of the Search of
Information Associated with Apple ID
tommy.townsend@live.com
that is Stored at Premises Controlled by Apple, Inc.

Case No.   22-9489 MB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A**

located in the Northern District of California, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2251 and 2252 | Crimes related to Child Pornography |
| 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) | Possess with Intent to Distribute Cocaine |

The application is based on these facts:

**See attached Affidavit of Special Agent Candace M. Rose**

☒ Continued on the attached sheet.
☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Brett A. Day    BRETT DAY Digitally signed by BRET DAY Date: 2022.12.15 15:25: -07'00'

_Applicant's Signature_

Candace M. Rose, Special Agent, FBI
_Printed name and title_

Sworn to and signed electronically.

Date: __12/15/2022@6:03pm__

_Judge's signature_

City and state: Phoenix, Arizona

Honorable EILEEN S. WILLETT, U.S. Magistrate Judge
_Printed name and title_

**ATTACHMENT A**

**DESCRIPTION OF THE PROPERTY TO BE SEARCHED**

This warrant applied to information associated with the Apple Account associated with the email address tommy.townsend@live.com, from January 1, 2020 to the date the legal process is signed, that is stored at premises owned, maintained, controlled, or operated by Apple, Inc. a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

<u>**ATTACHMENT B**</u>

**PARTICULAR THINGS TO BE SEIZED AND SEARCHED**

I.       **Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made on November 18, 2022 under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A, from January 1, 2020 to present:

a.       All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP Address used to register the account, the account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.       All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.      The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      All activity, connection, and transactional logs for the account (with associate IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access

2

of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

   g. All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

   h. All records pertaining to the types of services used;

   i. All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

   j. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

   k. Notwithstanding 18 U.S.C. §§ 2252 and 2252A or any similar statute or code, Apple, Inc. shall disclose responsive data by sending it to FBI – Phoenix, c/o: SA Candace M. Rose, 21711 North 7th Street, Phoenix, Arizona, 85024.

   l. The Provider is hereby ordered to disclose the above information to the government with **14 days** of service of this warrant.

**II.** **Information to be seized by the government**

  All information described above in Section I that constitutes contraband, fruits, evidence and/or instrumentalities of violations of 18 U.S.C. §§ 2251(a) and (e); 18 U.S.C. §§ 2252(a)(2); 18 U.S.C. §§ 2252(a)(4)(B); 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); 18 U.S.C. § 924(c)(1)(A); and 18 U.S.C. §§ 1519 involving the accounts listed in Attachment A since January 1, 2020, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

   a. The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s):

b.      Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crimes under investigation and the account subscriber;

c.      Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

d.      Evidence indicating the subscriber's state of mind as it relates to the crimes under investigation, and

e.      Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

## ELECTRONICALLY SUBMITTED AFFIDAVIT IN
## SUPPORT OF SEARCH WARRANT

I, Special Agent Candace M. Rose, being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.      A summary of the facts of this case, as more fully detailed herein, are that an individual, who is a resident of Scottsdale, Arizona, purchased child pornography and child erotica photographs from an adult male **(G.D.)** who acted like a professional photographer and did photoshoots with minors.  The investigation lead to the identification of **Thomas TOWNSEND** of 9555 East Raintree Drive, Unit 1055, Scottsdale, Arizona 85260 as being someone who purchased images from the photographer.

2.      I am a Special Agent with the Federal Bureau of Investigation assigned to the Phoenix Division.  I have been so employed for nineteen years and I am specifically assigned to conduct investigations pursuant to the FBI's Innocent Images National Initiative (IINI), which focuses on crimes where computers and the Internet are used in the sexual exploitation of children. I am responsible for conducting federal and international investigations relating to crimes involving the sexual exploitation of children.  I have received basic, advanced, and on-the-job training in the investigation of cases involving the sexual exploitation of children.  The statements contained in this Affidavit are based on my experience and background as a Special Agent and on information provided by other law enforcement agents.

3.      On November 9, 2022, Honorable Eileen S. Willett, United States Magistrate, United States District Court for the District of Arizona authorized three federal search warrants - one for the person of **Thomas TOWNSEND** (Case 22-9415MB); one for the residence at 9555 E. Raintree Drive, Unit 1055, Scottsdale, Arizona 85260 **(SUBJECT PREMISES)** (Case 22-9416MB); and one for the 2021 Range Rover Sport, Arizona registration "ERMD2" registered to **Thomas TOWNSEND** at **SUBJECT PREMISES** (Case 22-9417MB).  The search warrants were related to violations of 18 U.S.C. §§ 2251(a) and (e), which makes it a crime to produce child pornography and attempt to produce child pornography, violations of §§ 2252(a)(2) which makes

it a crime to knowingly receive child pornography, and violations of 18 U.S.C. §§ 2252(a)(4)(B) which makes it a crime to possess, or knowingly access with intent to view child pornography.

4.     On November 16, 2022, these warrants were executed.  **Thomas TOWNSEND** was contacted by law enforcement and fled back inside of his residence with a gun in his hand. He contacted 9-1-1 and made suicidal statements.   Eventually, **Thomas TOWNSEND** surrendered, and entry was made into his residence.  When he surrendered, he had a phone in his hand.  The search warrants were executed on the residence and the vehicle.  Inside the vehicle, several electronic devices were found.  Inside the residence, several electronic devices, guns, ammunition, body armor, and suspected drugs were located.

5.     On November 16, 2022, while **SUBJECT PREMISES** was still secured by law enforcement, Honorable Deborah M. Fine, United States Magistrate, United States District Court for the District of Arizona authorized two federal search warrants – one for the 2021 Range Rover Sport, Arizona registration "ERMD2" registered to **Thomas TOWNSEND** at **SUBJECT PREMISES** (Case 22-5488MB), which included the cell phone in **TOWNSEND'S** hand; and one for the residence at 9555 E. Raintree Drive, Unit 1055, Scottsdale, Arizona 85260 **SUBJECT PREMISES** (Case 22-5489MB).  The search warrants were related to violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (knowing and intentionally possess with intent to distribute cocaine) and 18 U.S.C. § 924(c)(1)(A) (knowingly use, carry and brandish a firearm during and in relation to a drug trafficking crime, and knowingly possess and brandish a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in a Court of the United States, that is, Possession with Intent to Distribute Cocaine).

6.     I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require the Communication Account Provider (Apple, Inc.) to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the **SUBJECT ACCOUNTS**, including the contents of communications.  As to the accounts, the evidence and information to be searched is described in the following paragraphs and in **Attachment A**.  There is probable cause to believe that the accounts constitute and/or contain evidence, fruits, contraband, and instrumentalities of

violations of 18 U.S.C. §§ 2251 and 2252 (crimes related to child pornography); 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (knowing and intentional possess with intent to distribute cocaine) and 18 U.S.C. § 924(c)(1)(A) (knowingly use, carry and brandish a firearm during and in relation to a drug trafficking crime, and knowingly possess and brandish a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in a Court of the United States, that is, Possession with Intent to Distribute Cocaine); and 18 U.S.C. §§ 1519 (knowingly alters, destroys, mutilates, conceals, covers up, falsifies or makes a false entry in any record, document, or tangible object).

7.      Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that are necessary to establish probable cause to believe that evidence of violations of the **TARGET OFFENSES** is located in the iCloud Accounts (tommy.townsend@live.com   and   t2tommy@icloud.com)   (**"SUBJECT   ACCOUNTS"**), controlled by **Thomas TOWNSEND**, more particularly described in **Attachment A** of the search warrant, for the evidence, instrumentalities, and/or fruits of these crimes further described in **Attachment B**.

## II.     ACCOUNTS TO BE SEARCHED

8.      The **SUBJECT ACCOUNTS**, namely, the iCloud Accounts associated with tommy.townsend@live.com and t2tommy@icloud.com, which are associated and controlled by **TOWNSEND.** The **SUBJECT ACCOUNTS** are more fully described in **Attachment A** of the warrant.

9.      By this affidavit, I am requesting authority to search the **SUBJECT ACCOUNTS**, that are stored at the premises owned, maintained, controlled, or operated by Apple, Inc., an online

storage media platform headquartered at 1 Infinite Loop, Cupertino, California 95014, more fully described in **Attachment A.**

### III.   JURISDICTION

10.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3) and 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States ... that has jurisdiction over the offenses being investigated."  18 U.S.C. §2711(3)(A)(1).

### IV.   DEFINITIONS

11.     The following definitions apply to this Affidavit:

a.     "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

b.     "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors, but that are not, in and of themselves, obscene or illegal.  In contrast to "child pornography," this material does not necessarily depict minors in sexually explicit poses or positions.  Some of the more common types of child erotica include photographs that are not sexually explicit, drawings, sketches, fantasy writing, and diaries.  See Kenneth V. Lanning, Child Molesters: A Behavioral Analysis (2001) at 65.  Federal courts have recognized the evidentiary value of child erotica and its admissibility in child pornography cases.  *See United States v. Cross,* 928 F.2d 1030 (11th Cir. 1991) (testimony about persons deriving sexual satisfaction from and collecting non-sexual photographs of children admissible to show intent and explain actions of defendant); *United States v. Riccardi,* 258 F.Supp.2d 1212 (D. Kan.,

2003) (child erotica admissible under Federal Rule of Evidence 404(b) to show knowledge or intent).

   c. "Minor" means any person under the age of eighteen years.  See 18 U.S.C. § 2256(1).

   d. "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means, which is capable of conversion into a visual image, and data, which is capable of conversion into a visual image, that has been transmitted by any means, whether or not stored in permanent format. *See* 18 U.S.C. § 2256(5).

   e. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).   Whether a visual depiction constitutes such a lascivious exhibition requires a consideration of the overall content of the material, including whether the focal point of the visual depiction is on the child's genitalia or pubic area; whether the setting of the depiction is sexually suggestive, that is, in a place or pose associated with sexual activity; whether the child is depicted in an unnatural pose or in inappropriate attire, considering the age of the child; whether the child is fully or partially nude; whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; or whether the depiction is designed to elicit a sexual response in the viewer.

   f. "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

   g. "Computer hardware," as used herein, consists of all equipment, which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data processing devices (including, but not limited to, central processing units, modems and routers, internal and

peripheral storage medium); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

h.     "Computer software," as used herein, is digital information, which can be interpreted by a computer and any of its related components, to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

i.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to, or hide, computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alphanumeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.     The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

k.     "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet.  IP addresses can be dynamic, meaning that the Internet Service Provider (hereinafter "ISP") assigns a unique and different number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address, which is used each time the computer accesses the Internet.

l.     "Internet Service Providers" (ISPs) are commercial organizations, which provide individuals and businesses access to the Internet.  ISPs provide a range of functions for

their customers including access to the Internet, web hosting, e-mail, remote storage and co-location of computers and other communications equipment. ISPs can offer various means to access the Internet, including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system and can access the Internet by using his or her account name and password.

      m.    "ISP Records" are records maintained by ISPs pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files.

      n.    "Log Files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a website was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

      o.    "Storage medium" or "storage media" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory,

CD-ROMs, DVDs, personal digital assistants, multimedia cards, and other magnetic or optical media.

p.      "Cloud storage" is an online storage medium, which allows users to access their files from anywhere using a device connected to the Internet.

q.      The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, or painting), photographic form (including, but not limited to, microfilm, microfiche, prints, or slides, negatives, videotapes, motion pictures, or photocopies), mechanical form (including, but not limited to, phonograph records, printing, or typing), or electrical, electronic or magnetic media (including, but not limited to, flash drives, hard drives, servers, mobile phones, CDs/DVDs, printer buffers, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

r.      "Digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including the following: central processing units; laptop or notebook computers; PDAs; wireless communication devices such as telephone paging devices, beepers and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors and drives intended for removable media; related communications devices such as modems, cables and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips; and security devices.

s.      "Image" or "copy" refers to an accurate reproduction of information contained on an original physical item, independent of the electronic storage device.  "Imaging" or "copying" maintains contents, but attributes may change during the reproduction.

t.      "Hash value" refers to a mathematical algorithm generated against data to produce a numeric value that is representative of that data.  A hash value may be run on media to find the precise data from which the value was generated.  Hash values cannot be used to find other data.

u.      "Steganography" refers to the art and science of communicating in a way that hides the existence of the communication. It is used to hide a file inside another. For example,

a child pornography image can be hidden inside another graphic image file, audio file or other file format.

        v.     "Compressed file" refers to a file that has been reduced in size through a compression algorithm to save disk space. The act of compressing a file will make it unreadable to most programs until the file is uncompressed.

        w.     "Domain Name" refers to the common, easy to remember names associated with an Internet Protocol address. For example, a domain name of www.usdoj.gov refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters with each level delimited by a period. Each level, read backwards - from right to left- further identifies parts of an organization. Examples of first level or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second level names will further identify the organization. For example, usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the world wide web server located at the United States Department of Justice, which is part of the United States government.

        x.     "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

        y.     "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

        z.     "Uniform Resource Locator" or "Universal Resource Locator" or "URL" is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies a

specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

## V.   BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY AND ONLINE CHILD EXPLOITATION

12.     Based upon my knowledge, training and experience in online child exploitation and child pornography investigations, as well as the experience and training of other law enforcement officers with whom I have had discussions, I have learned the following:

a.     Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, stored and communicated as a commodity and a further tool of online child exploitation.

b.     Individuals can transfer photographs from a camera onto a computer-readable format with a variety of devices, including scanners, memory card readers, or directly from digital cameras.

c.     Modems allow computers to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.

d.     The capability of a computer to store images in digital form makes the computer itself an ideal repository for child pornography.  As explained further below, the storage capacity of electronic media used in home computers has increased tremendously within the last several years.  These drives can store extreme amounts of visual images at very high resolution.

e.     The Internet, the World Wide Web and other Internet components afford individuals many different and relatively secure and anonymous venues for obtaining, viewing and trading child pornography or for communicating with others to do so or to entice children.

f.     Individuals can use online resources to retrieve, store and share child pornography, including services offered by Internet Portals such as Google, America Online (AOL), Yahoo! and Hotmail, among others.  Online services allow a user to set up an account providing e-mail and instant messaging services, as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with

access to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.  And even in cases where online storage is used, evidence of child pornography can be found on the user's computer in most cases.

g.      As is the case with most digital technology, computer communications can be saved or stored on hardware and computer storage media used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  However, digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained for very long periods of time until overwritten by other data.

h.      The interaction between software applications and the computer operating systems often results in material obtained from the Internet being stored multiple times, and even in different locations, on a computer hard drive without the user's knowledge.  Even if the computer user is sophisticated and understands this automatic storage of information on his/her computer's hard drive, attempts at deleting the material often fail because the material may be automatically stored multiple times and in multiple locations within the computer media.  As a result, digital data that may have evidentiary value to this investigation could exist in the user's computer media despite, and long after, attempts at deleting it.  A thorough search of this media could uncover evidence of receipt, distribution and possession of child pornography.

i.      Data that exists on a computer is particularly resilient to deletion.  Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools.  When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear,

rather, the data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed and more on a particular user's operating system, storage capacity, and computer habits.

## VI.    BACKGROUND ON CELLULAR PHONES AND CHILD PORNOGRAPHY AND ONLINE CHILD EXPLOITATION

13.    Based upon my knowledge, training and experience in online child exploitation and child pornography investigations, as well as the experience and training of other law enforcement officers with whom I have had discussions, I have learned the following:

a.    Cellular telephones have revolutionized the way in which child pornography is produced, distributed, stored and communicated as a commodity and a further tool of online child exploitation.

b.    A cellular telephone is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and

moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

        c.     The capability of a cellular telephone to store images in digital form makes the cellular telephone itself an ideal repository for child pornography. As explained further below, the storage capacity of electronic media used in home cellular telephones has increased tremendously within the last several years. These drives can store extreme amounts of visual images at very high resolution.

        d.     The Internet, the World Wide Web and other Internet components afford individuals many different and relatively secure and anonymous venues for obtaining, viewing and trading child pornography or for communicating with others to do so or to entice children.

        e.     Individuals can use online resources to retrieve, store and share child pornography, including services offered by Internet Portals such as Google, America Online (AOL), Yahoo! and Hotmail, among others. Online services allow a user to set up an account providing e-mail and instant messaging services, as well as electronic storage of cellular telephone files in any variety of formats. A user can set up an online storage account from any cellular telephone with access to the Internet. Evidence of such online storage of child pornography is often found on the user's cellular telephone. And even in cases where online storage is used, evidence of child pornography can be found on the user's cellular telephone in most cases.

        f.     The interaction between software applications and the cellular telephone operating systems often results in material obtained from the Internet being stored multiple times, and even in different locations, on a cellular telephone hard drive without the user's knowledge. Even if the cellular telephone user is sophisticated and understands this automatic storage of information on his/her cellular telephone's storage, attempts at deleting the material often fail because the material may be automatically stored multiple times and in multiple locations within the cellular telephone media. As a result, digital data that may have evidentiary value to this investigation could exist in the user's cellular telephone media despite, and long after, attempts at

deleting it.  A thorough search of this media could uncover evidence of receipt, distribution and possession of child pornography.

## VII.   <u>BACKGROUND ON TELEGRAM</u>

14.   Telegram Messenger is a cloud based instant messaging service which is heavily encrypted.  The platform is available on most iOS, Android, Windows, Mac, and Linux operation systems free of charge.  There are also paid versions of the Telegram platform available for purchase.  Telegram provides optional end-to-end encrypted chats to ensure data can't be accessed by ISPs or third parties.  Users can send text and voice messages, make voice and video calls, and share an unlimited number of images, documents, and other files.  Telegram also offers secret chats which are encrypted, can be deleted at any time, and can optionally self-destruct.  The secret chats have to be initiated and accepted via an invitation.  Telegram uses a smartphone's data plan, Wi-Fi, or Internet to transmit and receive messages.

## VIII.   <u>BACKGROUND ON APPLE, INC.</u>

15.   Apple offers a collection of Internet based services to users of Apple devices including services such as e-mail and online data storage.  This collection of services is known as iCloud, which is owned and controlled by Apple.

16.   Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices, via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.   Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com

b.   iMessage and FaceTime allow users of Apple devices to communicate in real time.  iMessage enables users of Apple devices to exchange instant messages ("iMessage")

containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

        c.      iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

        d.      iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

        e.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

        f.      Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

        g.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System (GPS) networks, and Bluetooth, to determine a user's approximate location.

        h.      App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac

OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

17. Subscribers with an Apple device obtain access to the iCloud services by registering on the Internet with Apple utilizing an existing or newly created "Apple ID." The Apple ID is a user name unique to each Apple subscriber which corresponds to an email address provided by the subscriber to Apple. Other information provided during the Apple ID registration includes name, address, and date of birth. Once a subscriber has an Apple ID account, the subscriber may then register online with Apple to utilize iCloud services. Upon registration for iCloud services, a subscriber is given an email account which ends in "@icloud.com" which can be utilized to send and receive email messages. Apple currently gives users the ability at the time of Apple ID creation to utilize an email address ending in @icloud.com as the Apple ID. Users may also utilize an email address that does not end in @icloud.com

18. Apple maintains electronic records pertaining to the individuals and entities who maintain subscriber accounts. These records often include account access information, e-mail transaction information, and account application information.

19. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number (ICCID), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other devices identifiers, including the Media Access Control address (MCA address), the unique device identifier (UDID), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users

and Apple customer services, including communications regarding a particular Apple device or service, and the repair history for a device.

20.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service (SMS) and Multimedia Messaging Service (MMS) messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messages service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

21.     An e-mail that is sent to an Apple, Inc. account subscriber is stored in the subscriber's "mail box" on Apple's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceed the storage limits preset by Apple. If the message is not deleted by the subscriber, the account is below the maximum storage limit, and the subscriber account remains active, that message can remain on Apple's servers indefinitely.

22.     When an Apple, Inc. account subscriber sends an e-mail, it is initiated by the user, transferred via the Internet to Apple's servers, and then transmitted to its end destination. Apple, Inc. account subscribers have the option of saving a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Apple, Inc. account subscriber's e-mail account, the e-mail may remain on the system indefinitely.

23.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kinds described in this Affidavit, may be found in the files and records described above. This evidence may establish the "who, what, why,

when, where and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further investigation.

24.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence in analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every deices that connects to the Internet must use an IP Address, IP Address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crimes under investigation.

25.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

26.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

27.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and

experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## IX.   FACTS SUPPORTING PROBABLE CAUSE

28.   On November 9, 2022, Honorable Eileen S. Willett, United States Magistrate, United States District Court for the District of Arizona authorized three federal search warrants - one for the person of **Thomas TOWNSEND** (Case 22-9415MB); one for the residence at 9555 E. Raintree Drive, Unit 1055, Scottsdale, Arizona 85260 (**SUBJECT PREMISES**) (Case 22-9416MB); and one for the 2021 Range Rover Sport, Arizona registration "ERMD2" registered to **Thomas TOWNSEND** at **SUBJECT PREMISES**.   The search warrants were related to violations of 18 U.S.C. §§ 2251(a) and (e), which makes it a crime to produce child pornography and attempt to produce child pornography, violations of §§ 2252(a)(2) which makes it a crime to knowingly receive child pornography, and violations of 18 U.S.C. §§ 2252(a)(4)(B) which makes it a crime to possess, or knowingly access with intent to view child pornography.   A summary of the facts of that case are that an individual, subsequently identified as **Thomas TOWNSEND**, purchased child pornography and child erotica photographs from an adult male (**G.D.**) who acted like a professional photographer and did photoshoots with minors

29.   On November 16, 2022, FBI Agents executed the search warrants.   A ruse was established to get **Thomas TOWNSEND** out of his residence.   When **Thomas TOWNSEND** exited the residence, he had a hand in his pocket and would not remove it.   After law enforcement identified themselves, **Thomas TOWNSEND** turned and ran away and pulled a handgun from his pocket.   He went back inside of his residence and a perimeter was established by law enforcement.

30.   **Thomas TOWNSEND** contacted 9-1-1 and stated that he was going to commit suicide.   He eventually decided to surrender and came out of the residence with a phone in his hand.   **Thomas TOWNSEND** was detained by law enforcement and entry was made into **SUBJECT PREMISES. Thomas TOWNSEND** was in his residence for approximately one hour before he surrendered.

31.   Inside the residence, during the initial safety clear, law enforcement officers observed multiple weapons, surveillance cameras, ammunition, a flash bang device, and suspected

drugs and drug indicia. The authorized search warrants were executed by additional law enforcement officers and employees and additional items of evidence were discovered. Numerous electronic devices were found in the residence and vehicle belonging to **Thomas TOWNSEND**.

32. **Thomas TOWNSEND** appears to live alone. Located next to his bed in his bedroom was an open gun safe. Inside the safe were three long guns that were loaded. A Glock handgun with the slide locked to the back was on his bed. Also on his bed was a tray that contained a white powdery substance. A field test done on a sample of this white powdery substance tested positive for the presence of cocaine. **Thomas TOWNSEND** had a large screen TV set up which showed some of his surveillance cameras. It appeared that an Apple iPhone located on the bed was being mirrored to the TV.

33. Special Agent Daniel Johnson, FBI, spoke with **TOWNSEND** on the phone during the barricade. **TOWNSEND** stated that he had a lot of guns out and was going to put them in the safe. He also said that he had done cocaine and that had contributed to him being on edge.

34. Special Agent Matthew Gunty, FBI, asked **TOWNSEND** some safety questions once he was in custody. **TOWNSEND** advised that he unloaded the Glock handgun and locked the slide to the rear. He stated that he placed the other guns in the safe and that they were loaded. **TOWNSEND** also stated that he had smoke bombs in his closet and a flash bang device.

35. In a drawer in the bathroom sink vanity, which has open access (no door) to his bedroom, there were baggies containing an off-white hard substance.

36. In the living room, additional white powdery residue and suspected marijuana were located. On the dining room table, there was a mirror with white powdery residue and a razor blade.

37. Inside the kitchen, there were two money counters, a few scales with residue on them, small baggies, and a safe inside a cabinet. Within the safe, there was a bag of suspected marijuana and a bag of a white powdery substance weighing approximately 144 grams, which is suspected cocaine. Unmarked pills, small baggies, and money wrappers were also located.

38.     Neighbors advised that **Thomas TOWNSEND** often has random people outside his door, going in and out at all hours of the day and night, and that **Thomas TOWNSEND** would often change the locks on his door.

39.     **Thomas TOWNSEND** made additional spontaneous statements to law enforcement officers stating that he had racked a round in his AK47 and then ejected it before surrendering.  He also commented that he snorted a bunch of cocaine before coming out.

40.     Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows that drug traffickers commonly use computers, cellular telephones, and other electronic devices to communicate with other drug traffickers and customers about drug-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums.  Moreover, drug traffickers commonly use other capabilities of computers and electronic devices to further their drug trafficking and money laundering activities.

41.     On November 16, 2022, while **SUBJECT PREMISES** was still secured by law enforcement, Honorable Deborah M. Fine, United States Magistrate, United States District Court for the District of Arizona authorized two federal search warrants – one for the 2021 Range Rover Sport, Arizona registration "ERMD2" registered to **Thomas TOWNSEND** at **SUBJECT PREMISES** (Case 22-5488MB), which included the cell phone in **TOWNSEND'S** hand; and one for the residence at 9555 E. Raintree Drive, Unit 1055, Scottsdale, Arizona 85260 (**SUBJECT PREMISES**) (Case 22-5489MB).  The search warrants were related to violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (knowing and intentionally possess with intent to distribute cocaine) and 18 U.S.C. § 924(c)(1)(A) (knowingly use, carry and brandish a firearm during and in relation to a drug trafficking crime, and knowingly possess and brandish a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in a Court of the United States, that is, Possession with Intent to Distribute Cocaine).

42.     Numerous items of evidence were seized from **SUBJECT PREMISES** in relation to the execution of the above described five federal search warrants.  Specifically, two Apple

iPhone 14 phones and an Apple MacBook Air were seized from the Range Rover. These items appeared to have been set to the factory default settings. **Thomas TOWNSEND** had another Apple iPhone 14 in his hand when he surrendered. This device is locked and unable to be forensically previewed at this time.

43.     Inside **SUBJECT PREMISES**, law enforcement discovered an Apple iPhone 12, an Apple iPad, and another Apple MacBook on **Thomas TOWNSEND'S** bed. The Apple MacBook appeared to have been factory reset. It is unknown when exactly the device was factory reset. The Apple iPhone 12 was unlocked for a period of time while at **SUBJECT PREMISES**. A Forensic Examiner on scene was able to briefly preview the phone. He observed that the Telegram Application had been downloaded via the iTunes store at some point, but the application was not currently on the device. Additionally, he observed several contacts on the phone that had Telegram User IDs associated with them. The device ended up locking and has been unable to be forensically previewed at this time.

44.     A forensic extraction was able to be completed on the Apple iPad found on the bed. The iPad was linked with the Apple ID "tommy.townsend@live.com." A review of the data showed several sexually explicit images of a female, whose age and identity are unknown. She appears as though she could be between the age of 16 and 19. Additionally, there was a contact card for the Subject **G.D.** as described in the Affidavits associated with the warrants authorized in Paragraph 28 above. One of the ways **Thomas TOWNSEND** communicated with **G.D.** was through the Telegram application.

45.     Also discovered on the Apple iPad was one shared Note between "tommy.townsend@live.com" and Apple user ID of a known, convicted drug user. The note had been created on August 4, 2022 and was last modified on October 29, 2022. The note contained text to include cash, credit, Cash App, and Apple Pay amounts. It appeared to reference different illegal and prescription drugs and prices such as "7g shrooms 50"; "7g bud =25"; Wax 4 jars 1292g 2.88lb @1000 = 2800$"; "2w = 1600" and "4s = 600".

46.     Within the iPad forensic extraction, there were several email addresses associated with the device and/or **Thomas TOWNSEND**.    Four of the email addresses were t2tommy22@gmail.com,     polosport1002@yahoo.com,     tommy.townsend@live.com,     and t2tommy@icloud.com.   On November 18, 2022, your Affiant served a preservation letter on Apple, Inc. in regards to the four email addresses.  On November 19, 2022, Apple, Inc. advised that  they  had  located  accounts  associated  with  tommy.townsend@live.com  and t2tommy@icloud.com and had preserved the accounts.

47.     Another Apple MacBook was located on top of the kitchen cabinet.  The computer could not be seen unless you climbed on top of the counter to see above the cabinets.   This MacBook also appeared to have been factory reset.  A 4TB internal hard drive was located behind a towel warmer on the kitchen counter.  The drive was unable to be forensically reviewed because it was inoperable.

48.     The seized Apple devices unable to be forensically reviewed are because they are locked or because forensic software isn't compatible with the installed iOS version on the devices. It is unknown when or if law enforcement will be able to complete a forensic review of these devices.

49.     Based on the state of the electronic devices, specifically seized from **SUBJECT PREMISES,** and the amount of time **Thomas TOWNSEND** had with his devices while he was aware that law enforcement was there to execute a search warrant, it is believed that **Thomas TOWNSEND** destroyed potential evidence, either by wiping/restoring devices, deleting certain applications from devices, and/or deleting certain images or communications.

50.     The drug evidence seized from **SUBJECT RESIDENCE** is currently undergoing processing at the DEA Laboratory.

## X.    CONCLUSION

51.     Based on the foregoing, there is probable cause to believe that violations of 18 U.S.C. §§ 2251(a) and (e), which makes it a crime to produce child pornography and attempt to produce child pornography; violations of §§ 2252(a)(2) which makes it a crime to knowingly

receive child pornography; violations of 18 U.S.C. §§ 2252(a)(4)(B) which makes it a crime to possess, or knowingly access with intent to view child pornography; violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (knowing and intentional possess with intent to distribute cocaine) and 18 U.S.C. § 924(c)(1)(A) (knowingly use, carry and brandish a firearm during and in relation to a drug trafficking crime, and knowingly possess and brandish a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in a Court of the United States, that is, Possession with Intent to Distribute Cocaine); and violations of 18 U.S.C. §§ 1519 (knowingly alters, destroys, mutilates, conceals, covers up, falsifies or makes a false entry in any record, document, or tangible object) have occurred, and that fruits, evidence, and instrumentalities of these offenses are located in **SUBJECT ACCOUNTS** belonging to **Thomas TOWNSEND**, listed in **Attachment A**.

52.     Therefore, I respectfully request a search warrant be issued by this Court authorizing the search and seizure of the items listed in **Attachment B**.

53.     Based on the foregoing, there is probable cause to believe that federal criminal statutes cited herein have been violated, and that fruits, evidence, and instrumentalities of these offenses are located in the **SUBJECT ACCOUNTS** listed in **Attachment A**.

54.     I am aware that the recovery of data by a computer forensic analyst takes significant time, much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered. Unless otherwise ordered by the Court, the return will not include evidence later examined by forensic analysts.

55.     This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

56.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Good cause therefore exists for the execution of this warrant at any time in the day or night.

Respectfully submitted,

Candace M. Rose

Special Agent

Federal Bureau of Investigation

**Affidavit submitted by email/.pdf and attested to me as true and accurate by telephone consistent with Federal Rules of Criminal Procedure 4.1 and 41(d)(3) on this _____15_____ day of December 2022.**

HONORABLE EILEEN S. WILLETT
UNITED STATES MAGISTRATE JUDGE